UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

JUAN CORDERO,

       Petitioner,

  -against-

WILLIAM LEE,

       Respondent.

------------------------------------------------------------- X

11-cv-6197 (ARR)

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

OPINION AND ORDER

ROSS, United States District Judge:

On December 12, 2011, Juan Cordero ("petitioner" or "Cordero"), appearing pro se, filed a petition for a writ of habeas corpus challenging his criminal conviction pursuant to 28 U.S.C. § 2254.[1] Cordero claims that he was denied the effective assistance of counsel because his trial attorney: (1) violated the "advocate-witness rule"[2] by acquiring "first hand knowledge of events at issue" through his pretrial interview alone with one of the complaining witnesses, and thereby became a potential witness for petitioner, Dkt. #1, at 29-30; and (2) "suffered from an additional conflict by virtue of his potential criminal exposure for allegedly instructing [the complaining witness] not [to] come to court to testify," id. at 30. For the reasons stated below, the petition is denied.

## I. BACKGROUND

On June 8, 1998, Cordero was convicted in the Supreme Court of the State of New York,

---

[1] The petition is dated December 12, 2011 on the signature block but was not filed until December 16, 2011. Dkt. #1, at 1, 14.

[2] "The advocate-witness rule . . . generally requires the lawyer to withdraw from employment when it appears that he . . . will be called to testify regarding a disputed issue of fact." People v. Paperno, 54 N.Y.2d 294, 299-300 (1981) (internal citation omitted).

1

Kings County, of two counts of Robbery in the First Degree in violation of New York Penal Law § 160.15. See People v. Cordero, 910 N.Y.S.2d 363, 363 (N.Y. App. Div. 2010). The evidence at trial showed that Cordero robbed livery cab drivers Herberto Arias and Edward Nunez at gunpoint on separate occasions in August 1997. The key issue at trial involved the perpetrator's identity, and the government relied primarily on the testimony of eyewitnesses Arias and Nunez to prove that Cordero was the culprit.

### A. Robbery of Herberto Arias

Arias served as a driver for Island Car Service. Trial Transcript ("Tr.") 76. On August 3, 1997, at approximately 2:25 A.M., Arias picked up Cordero and an accomplice at 714 46th Street in Brooklyn. Id. at 76-77. Petitioner sat down in the front seat, id. at 77, where Arias was able to see his face clearly, id. at 80, and the accomplice got into the back seat, id. at 77. After the cab arrived at the requested destination, the accomplice held a gun to Arias's head while Cordero put a gun to the driver's ribs. Id. at 81. Cordero took a chain and $153 from Arias. Id. at 82-83. Petitioner and his accomplice then ordered Arias out of the car and drove away in it. Id. at 83-84. Later that day, police recovered the car with its two radios missing. Id. at 84-85. Subsequently, Arias went to the police precinct on August 22, 1997, and identified Cordero in a six-person police line-up. Id. at 86, 550.

### B. Robbery of Edwin Nunez

Nunez served as a driver for Elegante Car Service. Id. at 164. On August 7, 1997, Nunez picked up Cordero and Ian Snedden at 1118 Ovington Avenue in Brooklyn. Id. at 164-68. Snedden got into the front seat, Cordero got into the back seat, and Nunez testified that he had no difficulty seeing Cordero's face. Id. at 166-69. Shortly thereafter, Snedden held a gun to Nunez's side while Cordero choked Nunez from behind. Id. at 170. The two men took Nunez's

gold chain, beeper, wallet, and credit card. Id. at 172. Snedden ordered Nunez out of the car and then drove away in it with Cordero. Id. at 173-74. Subsequently, the police recovered the car with its two radios missing. Id. at 174.

That same day, Nunez went to the police precinct and identified a photograph of Cordero after looking through between two to five photo books that each contained 125 photographs of Hispanic men. Id. at 184, 185, 545, 569. Nunez also testified that the police left him a message on August 22, 1997, informing him that they had apprehended the individual whom he had identified in the photograph, and asking him to come to the precinct for a lineup. Id. at 187. As requested, Nunez went to the precinct and identified Cordero from a six-person lineup that same day. Id. at 175, 550.

## C. Cordero's Trial

### 1. Nunez's Recantation and Allegation against Cordero's Attorney

Prior to the issuance of preliminary instructions on the first day of Cordero's trial, the prosecutor, Gail Ostriker, notified the court that she was "very concerned with an[] issue of [witness] tampering." Id. at 7. Specifically, Nunez had failed to show up at a meeting with Ostriker the day before, and had reported to her office that morning only after being served with a subpoena. Id. at 2. At that point, Nunez informed her that he had made a mistake and that Cordero was not the robber. Id. at 3. In addition to recanting his previous identification, Nunez told Ostriker that he had given a taped statement to Cordero's attorney, Salvatore Compoccia, who told Nunez not to come to court. Id. at 3-4. Furthermore, Ostriker learned that Cordero had specifically requested and hired Nunez's car on several occasions after the robbery. Id. at 4.

The trial judge acknowledged that, if true, these allegations were "very serious." Id. at 9. The judge then asked to hear from Compoccia, who explained that he had interviewed Nunez on

his own because he could not afford an investigator. Id. at 11. In addition, Compoccia "emphatically" denied ever having told Nunez not to come to court. Id. at 12. Instead, Compoccia asserted that, not knowing that Nunez had been subpoenaed, he had merely told Nunez, "[Y]ou do what you want." Id. at 12. In addition, Compoccia explained that Nunez "repeatedly picked up Mr. Cordero after this alleged incident" and, as a result, "realized that Mr. Cordero was a person wrongfully identified." Id. at 14.

In response, the court ordered an immediate hearing at which Nunez testified. Id. at 20-21. Nunez confirmed that Cordero had requested and taken his cab a number of times during the pendency of the case. Id. at 45-47. However, he testified, Cordero had never pressured him to recant his identification nor told him not to testify in court. Id. at 48. In addition, Nunez stated that he had sought out Compoccia and recanted his previous identification of Cordero in a tape-recorded conversation with the defense attorney. Id. at 23-26. During that conversation, Nunez also told Compoccia, "I honestly didn't want to come [to court] because I want to go with my wife, who's in the hospital because she's pregnant, so it's my first baby." Id. at 25-26. In response, Compoccia allegedly told Nunez that, because his statements had been recorded, he did not "need to come" to court. Id. at 26. "That's why I didn't come," Nunez explained. Id. After Nunez finished testifying, the trial court appointed attorney Mark Pliskow to represent him and ordered Nunez to report to court the following Monday. Id. at 49.

2. **Cordero's motion for a mistrial**

After Arias testified against Cordero, but before Nunez had done so, Compoccia moved for a mistrial on the ground that he could no longer "zealously represent [his] client" as a result of Nunez's allegations against him. Id. at 143. Compoccia explained, "[I]t is putting me in a position about my own interest, my own—subjecting myself to any possible incrimination based

upon what Mr. Nunez might say or questions that I asked. I'm boxed into a position." Id. at 154.

The court denied Compoccia's application for a mistrial but sought to prevent prejudice to the defense by "preclud[ing] the People from inquiring about any testimony on their direct-examination relating to Compoccia's conduct." Id. at 149-50. In addition, the court noted that whether or not the prosecutor would be able to broach the subject upon re-direct examination would depend on what unfolded during cross-examination. Id. at 150-51. Finally, the court ruled that inquiry into Cordero's seeking out of Nunez would be permitted as "evidence of consciousness of guilt." Id. at 160.

### 3. Nunez's testimony

At trial, Nunez ultimately testified against Cordero despite his earlier recantation. Id. at 163-82. Regarding the contacts between the two men following the robbery, Nunez asserted that Cordero had called Elegante and specifically requested Nunez's car on ten to fifteen separate occasions. Id. at 178, 201. These incidents occurred during the five months, id. at 207, that elapsed between when Nunez testified against Cordero before the grand jury, id. at 234, and when Nunez came to court to testify against Snedden, who was tried separately from petitioner, id. at 181. Nunez testified that these contacts made him nervous, id. at 204, but that he never told his boss, Jose Sanchez, who served as a dispatcher at Elegante, about them, id. at 194-95.

On cross examination, Nunez testified that he learned that Cordero was a frequent customer of Elegante who had patronized the car service both before and after the crime. Id. at 189-90. In addition, Nunez fully admitted to his prior recantation to Compoccia and provided an explanation. Id. at 214. When Compoccia asked Nunez, "Didn't you tell me that you had made a mistake and that it wasn't Mr. Cordero who robbed you on August 7?" Nunez responded, "Yes

because he was telling me that he was going to sue the guy who accuse[d] him and I didn't want to be sued. I was getting nervous." Id. And, on re-direct examination, Nunez elaborated that, during the times when Cordero specifically requested and took his car, Cordero would bring up the case and inquire into who had robbed Nunez. Id. at 235.

At one point during her re-direct examination of Nunez, Ostriker asked about Compoccia's interview of the driver, and the following exchange unfolded:

> Q. Did you tell him the truth about Mr. Cordero on that day?
> A. No.
> Q. Why?
> A. Because I was afraid to get sued.
> Q. And did you tell Mr. Compoccia that you were supposed to come to court?
> A. Yes.
> Q. And what did he tell you?
> A. Like I'm not supposed to come here. I thought the tape, the conversation that we had, I thought I was going to bring it to you, the Judge.
> Q. That he was going to bring the tape to the Judge, so you would not have to come here?
> MR. COMPOCCIA: Objection.
> THE COURT: Sustained.

Id. at 237. Thereupon, the court held a side bar conference. Id. Compoccia asserted, "Ms. Ostriker, by asking the question has totally, completely, totally ruined my credibility in front of the jury." Id. at 237-38. He also claimed that "Mr. Cordero has been [severely] prejudiced." Id. at 238. In response, the judge issued a curative instruction to the jury:

> I [am] going to sustain the objection to the last question. You remembered, as we got started that I told you that questions by themselves and/or answers by themselves do not mean anything. Since I'm sustaining the objection, all you have left is a question. And therefore, you're to completely disregard it and put it out of your mind as if you never heard it.

Id. at 242-43.

Subsequently, Compoccia questioned whether Nunez had spoken to anyone from the police department between his recantation and the trial. Id. at 244. Nunez denied doing so and asserted that he had spoken only to his own attorney. Id. He likewise denied having ever told Sanchez that

6

"someone in the DA's office or the DA people told [him] that they were going to charge [him] with perjury." Id. at 786.

### 4. Jose Sanchez's Testimony

After Nunez finished testifying, Compoccia called Jose Sanchez to the stand. Id. at 658. Sanchez acknowledged that Cordero was a "faithful customer" of Elegante, id. at 666-67, who had patronized the car service "[t]wo, three times a day, sometimes more," for "two to three years at least," id. at 668. Indeed, Sanchez testified that Cordero had taken an Elegante car on August 8, 1997, the day after Nunez was robbed. Id. at 803-04. In addition, Sanchez claimed that he was able to recognize Cordero's voice, and that the individual who called for Nunez's car on the night of the crime had a different voice. Id. at 674-75. Sanchez also stated that there were other drivers, aside from Nunez, whom Cordero frequently requested. Id. at 707. One of these drivers, Luis Sanchez, later testified that Cordero had been a frequent passenger of his for about a year and a half, and that Cordero always paid his fare. Id. at 847.

Furthermore, Jose Sanchez testified that he had spoken to Nunez the Friday before Cordero's trial. Id. at 796. According to Sanchez, Nunez had admitted that he "didn't know [the robber] was [Cordero] and he wasn't sure." Id. at 797. In addition, Compoccia elicited the following testimony from Sanchez:

> A     [Cordero] told me, I went there and told them I wasn't sure it was him and it wasn't him. And, but there was a big something going on in court. And they took me back to the room, and they said to me that if I changed what I said, that they are going charge with me with perjury and so on.
> Q     And did he tell you who told him that?
> A     He told me the DA, the people from the DA, and they appointed him a lawyer. That's what he told me.
> Q     Did he tell you who specifically told him he was going to be charged with perjury?
> A     He told me "they."
> Q     What did he mean by "they"?
> A     It could have been the DA's people, I guess, because he was testifying for them.
>      . . . .
> Q     You also testified that he kept—he used the word "they."

7

| | |
|---|---|
| A | Uh-huh. They brought me to this room, and they told me that I had better say what I said the first day, I couldn't change the testimony now, they was going to charge me with perjury. That was in order to—I guess he got a little scared or something, I don't know.<br><br>. . . .<br><br>He said, he just said that he didn't say, like, I'm going to say this or I'm going to say that, to me. He didn't say that. He just said like they trying to scare me. And we were talking, are you sure it was this guy, you know. I told him that it wasn't this guy and—but they still wanted me to say what I said from the beginning. I told the cops that I wasn't too sure, not sure it was this guy from the beginning. |
| Q | He told you that? |
| A | Uh-huh. |
| Q | He told you he told the cops from the beginning that he wasn't sure if it was this guy? |
| A | Uh- huh. |

Id. at 797-801.

### D. Subsequent History

Following his conviction on June 8, 1998, People v. Cordero, 910 N.Y.S.2d at 363, Cordero filed an appeal in the Appellate Division of the New York Supreme Court on January 29, 2010, Dkt. #1, at 15. Cordero's opening brief, prepared by appellate counsel, raised the same two contentions presented in the instant petition. Id. at 29-30.

The Appellate Division denied Cordero's appeal on October 13, 2009. People v. Cordero, 910 N.Y.S.2d 363. The court explained:

> The defendant was not deprived of the effective assistance of counsel due to the existence of an alleged conflict of interest. A defendant alleging ineffective assistance of counsel based on a conflict of interest must do more than show that the defense counsel had a potential conflict of interest. To prevail, the defendant must show that the conduct of [the] defense was in fact affected by the operation of the conflict of interest, or that the conflict operated on the representation. Here, the defendant failed to make such a showing.

Id. at 363-64 (alteration in original) (internal citations and quotation marks omitted).

With the assistance of appellate counsel, Cordero applied for leave from the New York Court of Appeals to appeal the decision of the Appellate Division. Dkt. #5-3, at 64-67. The

Court of Appeals of New York issued a summary denial. See People v. Cordero, 946 N.E.2d 182 (N.Y. 2011).

## II. DISCUSSION

### A. Standard of Review

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a deferential standard that federal habeas courts must apply when reviewing state court convictions. 28 U.S.C. § 2254(d). The statute provides, in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

Id. The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established Supreme Court precedent if "the state court applies a rule that contradicts" Supreme Court precedent or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." Id. at 405-06. With respect to the "unreasonable application" clause, "a federal habeas court . . . should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington v. Richter, --- U.S. ---, 131 S. Ct. 770, 784 (2011).

### B. Ineffective Assistance of Counsel

Cordero argues that the court should grant his habeas petition because he was denied the effective assistance of trial counsel due to Compoccia's conflicts of interest. Dkt. #1, at 5.

#### 1. Legal standard

"A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." United States v. Blau, 159 F.3d 68, 74 (2d Cir. 1998). If the defendant shows that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance," then prejudice is presumed. Cuyler v. Sullivan, 446 U.S. 335, 349-50 (1980). The Second Circuit has explained that courts should assess these factors through "a single, integrated inquiry." Eisemann v. Herbert, 401 F.3d 102, 107 (2d Cir. 2005). In other words, "the Sullivan standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect. An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." Mickens v. Taylor, 535 U.S. 162, 172 n.5 (2002). To meet this standard, a defendant must suggest a plausible alternative strategy that counsel failed to pursue at trial. Eisenmann, 401 F.3d at 107; United States v. Feyrer, 333 F.3d 110, 116 (2d Cir. 2003) ("To prove the lapse in representation 'a defendant must demonstrate that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'") (quoting United States v. Schwarz, 283 F.3d 76, 92 (2d Cir. 2002)).

"In the absence of [an actual] conflict of interest, a defendant claiming ineffective assistance of counsel must demonstrate that the lawyer's representation 'fell below an objective standard of reasonableness,'" and that counsel's deficiency was 'prejudicial' to the defense."

10

Eisemann, 401 F.3d at 107 (quoting Strickland v. Washington, 466 U.S. 668, 687-88, 692 (1984)). A court need not decide both prongs of this test if there is an insufficient showing on either one. See Strickland, 466 U.S. at 697.

Moreover, when ineffective assistance of counsel claims are presented on collateral habeas review, the court assesses them subject to the strictures of AEDPA and must be "doubly deferential" in reviewing the state court's determination that counsel acted effectively. Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (citing Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (per curiam)); see 28 U.S.C. § 2254(d)(1). Thus, to prevail on an ineffective assistance of counsel claim on habeas review, Cordero must show not only that counsel's performance fell below the Sullivan or Strickland standard, but also that the state court's adjudication of those standards was itself unreasonable. See Richter, 131 S. Ct. at 785. Stated differently, the court may afford habeas relief only upon a finding that the state court was unreasonable—and not merely incorrect—in concluding that petitioner was effectively assisted by counsel. See id.

2. **Analysis**

i. **There was no actual conflict of interest**

Cordero has failed to demonstrate that Compoccia was burdened by an "an actual conflict of interest [that] adversely affected his . . . performance." Sullivan, 446 U.S. at 350; see also Mickens, 535 U.S. at 171 ("[W]e think 'an actual conflict of interest' meant precisely a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties.").

a. **Compoccia's interview of Nunez**

Petitioner first argues that Compoccia violated the "advocate-witness rule" when he acquired "first hand knowledge of events at issue" through his pretrial interview of Nunez and "such knowledge potentially ma[de] him a witness for . . . his client." Dkt. #1, at 29 (emphasis

11

added). However, as Cordero's own brief appears to acknowledge, this conflict was only potential. See id. It is true that an actual conflict would have materialized had Nunez denied recanting his identification of Cordero. Under such a circumstance, Compoccia's testimony, recounting his interview with the driver, would have been necessary to impeach Nunez.

However, this need never arose. The Supreme Court has noted that, in assessing whether a conflict of interest existed, "courts may rely on evidence and testimony whose importance only becomes established at the trial." Mickens, 535 U.S. at 173. Taking such an approach here, it is clear that Nunez fully acknowledged on cross examination that he had, prior to trial, told Compoccia that he had misidentified Cordero. Accordingly, Compoccia's testimony would have contributed little to Cordero's defense beyond corroborating Nunez's admission. Furthermore, nothing to which Compoccia could have testified would have refuted Nunez's subsequent explanation as to why he recanted his original identification—that is, his fear that Cordero would sue him.

Tellingly, Cordero has not identified any "plausible defense strategy that was foregone as a consequence of [counsel's] conflict of interest," Eisemann, 401 F.3d at 108. Nor could he do so. The record demonstrates that Compoccia mounted a vigorous defense of petitioner, advancing every plausible strategy that would cast doubt on the government's witnesses and provide an innocent explanation for Cordero's repeated contacts with Nunez following the crime. Among other things, Compoccia conducted a thorough cross-examination of Nunez, making clear to the jury that the driver had previously recanted his identification of Cordero; Compoccia also elicited testimony from Jose Sanchez regarding Nunez's purportedly mistaken identification. The reason why Nunez ultimately testified against Cordero, Compoccia's direct examination of Sanchez moreover elicited, was because staff from the DA's office had

12

threatened to charge the driver with perjury in the event that he recanted his earlier statements. Ultimately, the court cannot identify any plausible defense strategy that Compoccia avoided as a result of the "advocate-witness rule."

### b. Nunez's allegation against Compoccia

Cordero also maintains that Compoccia suffered from a conflict of interest "by virtue of his potential criminal exposure for allegedly instructing Nunez not to come to court to testify." Dkt. #1, at 5. However, any actual conflict of this kind was avoided by the trial judge's decision to exclude evidence pertaining to Nunez's allegation against Compoccia. The trial court prohibited the government from inquiring into this subject on direct examination of Nunez. And, when the issue briefly surfaced during Ostriker's re-direct examination of Nunez, the judge sustained Compoccia's objection and issued a curative instruction to the jury to "completely disregard" Ostriker's questioning.[3] Tr. 243.

The Second Circuit has held that

> [w]here an inadmissible statement is followed by a curative instruction, the court must assume "that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, . . . and a strong likelihood that the effect of the evidence would be devastating to the defendant."

United States v. Elfgeeh, 515 F.3d 100, 127 (2d Cir. 2008) (quoting Greer v. Miller, 483 U.S. 756, 766 n.8 (1987)); see also Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326,

---

[3] Technically, the trial judge sustained Compoccia's objection only to the prosecutor's second question on this subject, such that her first question, and Nunez's answer, remained in evidence: Q. "And what did [Compoccia] tell you?" A. "Like I'm not supposed to come here. I thought the tape, the conversation that we had, I thought I was going to bring it to you, the Judge." Tr. 237. However, the meaning of this question and answer, in isolation, was ambiguous, and the judge struck the prosecutor's subsequent, clarifying question: "That he was going to bring the tape to the Judge, so you would not have to come here?" Id. The clear implication of the judge's remedial action was that the jury must not to consider Nunez's allegation against Compoccia. Because a reasonable juror would have understood this implication, there is not "an overwhelming probability," United States v. Elfgeeh, 515 F.3d 100, 127 (2d Cir. 2008), that the jury nonetheless took into consideration Nunez's allegation that Compoccia tried to prevent him from testifying.

13

340 (2d Cir. 1993) ("It must be assumed that the jury followed instructions."). Here, the inflammatory nature of the suggestion that Compoccia tried to tamper with Nunez created some risk that the jury disregarded the trial judge's instructions.

However, the Second Circuit has presumed that juries comply with instructions to disregard far more inflammatory evidence. In Elfgeeh, for example, the Second Circuit acknowledged, "There can be little doubt that in the wake of the events of September 11, 2001, evidence linking a defendant to terrorism in a trial in which he is not charged with terrorism is likely to cause undue prejudice." 515 F.3d at 127. When such evidence was nonetheless introduced at Elfgeeh's trial, the trial judge "promptly gave a curative instruction to the jury, stating that the case was not about terrorism." Id. And when a government witness again suggested that the defendant was suspected of funding terrorist activities, the court gave another cautionary instruction. Id. Despite the highly inflammatory suggestion that Elfgeeh was implicated in terrorist activities, the Second Circuit held that there was "no indication that the jury was unable or unwilling to heed the court's repeated instructions that terrorism was not an element in the case." Id.

In light of Elfgeeh, this court is not persuaded that there was "an overwhelming probability," id., here that the jury ignored the trial judge's instructions to disregard questioning relating to Nunez's allegation that Compoccia told him not to testify. Furthermore, the properly presented evidence that implicated Cordero in the crimes was extremely strong. Among other things, Nunez identified Cordero's photograph within hours of the crime after looking through at least two photo books each containing 125 photographs. Both he and Arias, moreover, identified Cordero in a six-person lineup, and both drivers testified that they had seen Cordero clearly. In addition, Arias's identification of Cordero never wavered.

14

As before, Cordero fails to identify any plausible strategy that Compoccia avoided as a result of his potential conflict of interest. On the contrary, Cordero's and Compoccia's interests were <u>aligned</u> with respect to Nunez's allegation against defense counsel. In other words, it benefitted <u>both</u> attorney and client that Compoccia did not ask Nunez about his allegation. Had Nunez testified on this subject, the jury may have suspected that Cordero and Compoccia had conspired to prevent Nunez from testifying at trial. Aside from avoiding this discrete topic, Compoccia conducted a thorough cross-examination of Nunez that fully exposed the driver's prior recantation. There is no evidence that Compoccia's defense was restrained or diminished in any way to avoid uncovering Nunez's allegations against him.

### ii.  Cordero suffered no prejudice

Because there is no evidence that Compoccia sustained an actual conflict of interest, the court now assesses whether Cordero was nevertheless prejudiced by counsel's potential conflicts. See Eisemann, 401 F.3d at 107; see also Strickland, 466 U.S. at 687-88. The court finds that Cordero was not prejudiced. As discussed, Compoccia fully exposed Nunez's prior recantation through cross-examination. Compoccia's direct examination of Sanchez also provided evidence that Nunez ultimately testified against Cordero because the prosecutor's office had threatened him with perjury.

In addition, defense counsel's questioning revealed that Cordero had been a frequent, fare-paying customer of Elegante—who even tipped his drivers—for at least two to three years. Cordero had regularly patronized the car service before the crime occurred and continued to do so afterward; indeed, Cordero had taken the car service the day immediately after Nunez's robbery. As Compoccia asked the jury in closing, "Ask yourself again, plain, common sense, what person robs a car service one night and then the next day goes back and takes the car

15

service?" Tr. 907. Similarly, he exhorted the jury, "It's just simple common sense. What person will rob a car service that they are taking literally every day, or virtually every day, usually more than once a day constantly? Why would they rob that particular car service, and why would they go back to that car service after they did it?" Id. at 906; accord id. at 899 ("Would a guy who has held you up, . . . robbed him and attacked him, hijacked his car, go[] to get in the car with that same guy over, and over and over again? Ask yourselves, did he ever go to a cop and tell them this guy was in his car? No.").

Compoccia's defense also suggested that, given the frequency with which Cordero used the car service, it was no surprise that he had ended up taking Nunez's car a number of times following the robbery. Cordero also used other drivers frequently, and Nunez was merely one of the several drivers whom Cordero hired. Moreover, Compoccia's questioning revealed, Nunez had told him that it was through these post-crime contacts with Cordero that Nunez realized that petitioner was not the perpetrator. Id. at 215.

In light of this record, it is difficult to see how Cordero was prejudiced by Compoccia's representation. Accordingly, Cordero was not denied the effective assistance of trial counsel, and the state appellate court did not unreasonably apply Sullivan or Strickland in denying petitioner's claims.[4]

### III. CONCLUSION

The petition for a writ of habeas corpus is denied. Because Cordero has failed to make a

---

[4] Cordero also relies on state law to contend that the trial court erred by failing to "conduct a record inquiry of a defendant whose representation is potentially conflict-ridden in order to ascertain whether he or she has an awareness of the potential risks involved in that course and has knowingly chosen it." Dkt. #1, at 31 (citing People v. Gromberg, 38 N.Y.2d 307, 313-14 (1975)). However, "[a] federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law." Pulley v. Harris, 465 U.S. 37, 41 (1984); accord Wilson v. Corcoran, --- U.S. ---, 131 S. Ct. 13, 16 (2010) ("[I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."). In addition, the Supreme Court has held that a trial court's failure to inquire into a potential conflict of interest "does not reduce the petitioner's burden of proof" and that petitioner still must "establish that the conflict of interest adversely affected his counsel's performance." Mickens, 535 U.S. at 173-74.

"substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the court declines to issue a certificate of appealability. In addition, this court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. Coppedge v. United States, 369 U.S. 438, 444-445 (1962). The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

/S/ Judge Allyne R. Ross

Allyne R. Ross
United States District Judge

Dated: October 22, 2012
Brooklyn, New York